FARMS v. U.S. Good morning, welcome to the court. Whenever you're ready. Your Honors, this case is before this court because of two substantial errors committed by the Court of Federal Claims. In the subsequent light of Arkansas Game and Fish, decided in December 2012, subsequent to the Court of Federal Claims' decisions in July and October of 2012. First, because the court approving on re-argument that the pleading of a physical invasion claim was proper because the government, as you can see here from the board of this record of survey, all of this property is the property of Stueve Farms. But the government, by the survey, they went in and they imposed 12 monuments. We only talked about six because those are the only ones we could discover. But there are actually on the survey that was recorded, and we just discovered that too, was the 12 surveys demarked the line of the new 566 foot flood inundation line. What I can't understand about the marks, I do understand the physical taking argument that Judge Hewitt acknowledged that there is a taking of the particular few square inches of ground that were appropriated. But setting that aside, what is the legal significance of the markings or the survey maps? That is to say, what was different the day after the survey was conducted and recorded and that the markers were put in from the day before in terms of your legal rights in your property? Correct. Well, because, you see, if you go back to the original 556 foot easement that the government acquired by direct condemnation in the 1940s, you will see that the easement consists of two parts. Part one is the right to flood the property, an affirmative easement. But part two was the right to restrict the use of the property from any human habitation. It was a negative easement. It was an easement restricting the use of the property. This was not a flooding case. There's never been any flooding. Nobody's ever argued flooding. In fact, the judge said in 70 years or 80 years, since the 40s, there's been no flooding. What has happened to you is by the recording of this survey against our title, the government and plus the monuments, the 12 monuments describing the easement line. And if you look at this survey, and this, by the way, appears in the record at page 8200, if you're looking at your own appendix. How has the placement of the monuments diminished the value of the property? How does that constitute a taking? Well, because the monuments themselves and the recording of the survey placed an easement on the property, restricting our use of the property. Now, wait a minute. I thought the restrictions were the consequence of the zoning limitations that were imposed by the city in 2003. That's not so, Your Honor. Okay, well, the markers in the survey, I think were 1992, if I recall correctly. So if you, in 1994, had decided to put in a mall on your property below the 566 line, what legal remedy would either the federal government or the city have against you? Well, because the federal government would come into court and ask for an injunction, okay, against our building anything, right, that was of human habitation. Well, what I'm struggling with is, I mean, if I come and have a surveyor go through your backyard, and I put little markers in your backyard, I haven't taken anything other than the space for the markers. What is the legal consequence of, I mean, where is it set forth that the legal consequence of a survey is that there is a preclusion from then on for certain kinds of activity? That I didn't see anywhere in the record. Oh, sure, it's in the record. What is the consequence? Okay, the point being is that when those disks were put in, they were not just arbitrarily put in. They defined this new 566 foot line. Right. And they recorded the survey against our title. I understand that, but what I'm asking you is, and what legal consequence flows from that? What is the statute or regulation that says once we record a survey, you can't do any of the following things? Well, if you just want to have a survey, first of all, they have no right to go on to this problem. Okay? Because under California law, this is precondemnation, and you have the absolute right that you have to get the consent of the court and an order of the court. And let me tell you that the intrusion here is far worse. But you're arguing an easement that the government… Correct. Well, an easement is not a physical taking. It's a regulatory taking. No, sir. That's what we're trying to point out, is that there are… After Arkansas was decided, Arkansas said there is no per se rule relating to flooding. And I understand that this court was in a way compelled prior to the Supreme Court reversing its doctrines to recognize that there could be the anticipation of flooding. But this is not an anticipation of flooding case at all. The anticipation of flooding is the first part of the easement. Okay. An easement, your position then is that an easement was taken in 1992. That's correct. Right. Why is your complaint timely then? Because years have passed since 1992 without a flooding. Because it was done secretly, Your Honor. Because it was never… Oh, I see what you're arguing. There's discovery in 2012. That's right. It was all secret. We never knew about their invasion because they never asked our consent. They never got a court order. They went on, they buried these 12 disks, and then they record the survey in the book of surveys, which isn't part of the record title, you know, the chain of title. So there's no way for us to understand this. And then what they did is, on the basis of the survey, they amended the firm maps, you know, flood insurance rate maps, and sent those maps to Chino. And simply said, Chino, by the way, 2003, zoned our property from agriculture to high-density residential commercial mixed use. But Chino said, because of the survey and the firm map sent by the government, they, you know, they basically couldn't extend, they would have extended that zoning but for the government's taking of this easement. Now, what I think is important here, Your Honor, is this. On damages, this is really what the whole first thing is about. I mean, I understand you're asking, is this a physical taking in the first place? Well, it is. It's an intrusion on land. It's 12 intrusions on land. It clearly meets the Loretto standards. And the other thing is, the damages that the judge said, well, no, now, you see, you only have to, we only have to pay, the government only has to pay for the dirt removed. Well, that's wrong. That's not the law. The law is not what the government takes, right? But it's what the owner loses. And what we lost was the ability to build on 193 acres of land. And you'll notice that what they did was, when they did that survey, they didn't distinguish between the 556 line and the 566. They made it into one easement. Look at the survey. It's all one easement except for that rump of 23 acres without access. If there had been flooding, then you'd be here arguing a physical taking. By flood. By flood. There is no flood. Right. And you're saying there is no, you're not arguing a physical taking. By flood. No, we are. What you're arguing is that you're prevented from using the property, the land, in order to build residential. Correct. Okay. And Judge Bryson was asking you, what law is implicated here? And it seems to me that whatever law is implicated here that is preventing you from building on that property are regulations. We're dealing with a regulatory taking here, aren't we? No, we're not at all. Explain why not. Because there's no regulation. There are 11 acts that happen by the government here. First of all, the only law is the WRB. All right? The Water Resources Development Act. That occurred in 1986 when they again extended, you know, authorized the government to acquire or condemn the property. Not to regulate the property. There is no regulatory body here. There were no regulations ever issued. This is not rightness case because we didn't appeal to some board or administrative aid. There is none. What they did is they went on to the property. They did all of this. Then they said they acquired all of the 12 properties around. Then what they, you know, all surrounding, all under the 566. Why did they do that? I mean, if they had no obligation because of the anticipation of flooding, why did they acquire all those other properties? Is that just because of the goodness of their heart? The reason why, they went on. They negotiated with us. They said they were going to bring condemnation. They made an offer. And then they withdrew it. And then on top of that, the Corps of Engineers submits a letter in 2005 saying, we acknowledge that there is a future flowage easement on this property. And what we're, what's critical here. What is a future flowage easement? I mean, are you saying they acknowledge that they had already taken the easement? That's correct. That is correct. That's what they did. Are they saying that in the future, we anticipate that we will exercise? No, no, no. No, that's not what they said at all. And where's the letter in the record? Yes, the letter. Where is that? Oh, the letter. You have to have that. I, I, right now. Well, that's all right. I'll find it. What again was the letter exactly? The letter was written in 2005. And it was sent to the city of Chino because on, you know, we, because the applicant was applying for development of the 23 acres of land. Okay. That's in, the letter's in there. That's right. The letter's there. It's in the appendix. Okay. Now, the, the thing I want to point out is, is that the rule on damages, once there is a taking, no matter how minute, Loretto says, no matter how small or minimum the size. And remember, the table thing in Loretto, which also you could say, well, there was a New York state statute authorizing table companies to come on. Isn't that therefore a regulatory taking? No, the court said. It was definitely a physical take because they authorized the government to go on and acquire or condemn property. So it's a little box that goes in the corner of your apartment. Yeah. It's a little box. It's not. But you don't get the value of the whole apartment. Oh, yes, you do. Here's the deal. So the value of the entire $900,000 condominium? Okay. For a box? I'm sorry. Two square inches? Oh, no. Here's what the rule is. And that's what we just need to have discovery and, you know, a trial. The rule is that once there is this invasion, the compensatory damages are not measured by the amount of dirt removed, but simply by the difference in market value between the before and the after. And the difference in market value is huge. The testimony will show, and we put that into the record, that what can you do? You can't get a loan. You can't build. You can't do anything. Nobody will ever buy this property because it's all under this federal easement. Okay? And the whole point of this thing is we're just entitled to the normal rule of eminent domain. That is that inverse is no different than direct. You're entitled to the market value before and after. Well, now, as I understand it, this project was initiated in 1976. Is that right? 86. Was it 86? 86. Sorry. All right. 86. They initiated the project. So starting in 86, everybody knew that this was going to result in an increase in the line at which the potential flooding was up to 566, I gather. Right? Correct. And what happened was, Your Honor, I don't mean to… So what would happen was they entered into two agreements. That's the unbelievable part. They entered into this, you know, PCA and LCA in which the government, okay, and the Orange County Department, and we have to sue them in state court because we can't sue them in the court of claims. We have to sue the government here. And the point is that these agreements obligated them to acquire or condemn these properties. So why didn't the taking occur in 86? No, because that, you see, that's the key point of 86 is that that was just the authorization to go ahead to condemn, okay? There is no… You can't sue on the statute. That was the one thing that was made clear in a whole line of cases. And in my rebuttal, I'm going to deal with those cases, Your Honor, unless you want me to explore them now. Now, my understanding is that you had the opportunity to amend your complaint below to include the diminished value caused by the survey disc, but you did not do that. Yeah, there's a good reason. Haven't you waived that? No, Your Honor, we have not waived that. Because what that did was, if we had filed an amended complaint, we would have waived our constitutional argument. So what do you mean, you and your decision to not amend? No, we had presented a proposed amended complaint. The court rejected it. She said we're not entitled to damages based on the market value loss of the property, but only for the dirt removal. And you refused to amend on that? If we had amended to file a complaint that would have said that, we would have waived our constitutional right to the compensation and damages involved. And that's why we did not do it. We're bringing this constitutional decision. And the last thing I just want to say is that the court of federal claims also rejected this flood control easement because she said, well, it's only flooding can create an easement. Well, we know from Arkansas that that's all wiped out. The court said flooding is just like every other mine run of takings. There's no magical formula. There's no per se rule. So what she did needs amending. You have to amend her decision no matter what, because both prongs of her decision relied upon a per se recurring and permanent flooding rule. So this is why we think this case is of such critical importance, because it's the first opportunity you have to deal with the post-Arkansas environment. Well, you've run over your rebuttal time. That's quite all right. We asked you a large number of questions. We'll restore the three minutes. Thank you so much. And for the other side, we'll add another four minutes to even it out only if you need it. Thank you. Josh Wilson on behalf of the United States. May it please the court. I'd like to first address some of the arguments that the appellants were making concerning the survey markers claim, because I think it's important for the court to understand that that claim is actually not before the court on appeal. I think as some of Judge Reyna's questions were, the direction in which they were headed was the appellants were granted a 21-day period after the denial of their motion for reconsideration to amend their complaint to assert the Loretto-style theory with respect to the survey markers, and they didn't do it. And when those 21 days expired, they filed this appeal. And the effect of that is it created jurisdiction for the appeal. It created a final judgment. But as cases, I think, from the First, Third, and Seventh Circuit said it in our briefs, when you do that, when you elect to stand on your complaint and all your claims merge with the judgment, it becomes final, there's jurisdiction to hear the appeal. But it's very rare in those circumstances that if the judgment is affirmed, that they would be permitted to continue to proceed with that claim. They made a choice not to proceed with that claim. Well, they're not interested in the narrow claim. I'm not sure that they're right that they would have waived anything constitutional if they had proceeded that. But they're not interested, let's just say, in the minimal amount of damages that would flow from the actual appropriation of the space occupied by the markers. So that was what Judge Hewitt threw out, as you can amend, and we'll look at that, and you'll get your tiny award. That was the part of the cases, I understand what Judge Hewitt is saying, that was not pursued. What they do want to pursue, however, is the argument made in their motion for reconsideration and then reiterated in essence in the amended complaint that they did offer, but that was rejected on futility grounds. They did want to argue that the placement of the markers and the survey is a significant act legally establishing an easement. So that is what I understand the argument, the plaintiff's argument today to be. And it seems to me since Judge Hewitt dealt with the motion for reconsideration slash motion to amend by saying that the amended complaint would be futile, that we have to address the arguments that were made today. Do you disagree with anything I just said? I do. I do, Your Honor. Let me start with the first bit about what Judge Hewitt actually decided. It's not correct, as is stated in the appellant's briefs, that Judge Hewitt made some ruling about what just compensation, if any, would be due to them if they sued on the survey markers. That's not part of her ruling. I mean, there's a part of her ruling in which she discusses the amount of damages that the was not changed when they put forward this proposed amended complaint. But that was, she didn't say that some amount of money commensurate with that couldn't be recovered. She didn't make any ruling with respect to how much could be recovered. No, she didn't get to that. Right. But what I understand her to have done, and all I understand her to have done in inviting an amended complaint on the survey markers is to say, if you want to make a claim that the placement of the survey markers was a physical taking a la Loreto, then you have to amend. But that does not affect in any way, it seems to me, in her discussion of the futility issue, seems to me to support this view. It doesn't affect the question of whether they could continue to argue that there's an easement and use the placement of the markers and the survey in support of their easement argument, which is what they're doing today. Your Honor, I think that's correct. Okay, that's all I'm saying. I would note, however, Your Honor, that the trial court, when it ruled on this motion for reconsideration, it denied the motion on a couple of grounds. It denied the claims, first of all, as being untimely. So the theories that the constructive and de facto and hybrid takings theories that the appellants put forward in their motion for reconsideration. Chief Judge Hewitt exercised her discretion to rule that those were untimely. She did go on and rule that if pleaded, they would be futile. As I read her opinion, and here I have to take issue with the way you characterize what she did in your brief, as I read her opinion, she said two things. She said, number one, on the motion for reconsideration, that's subject to Rule 59 standards, and one of which is you can't come in with a brand new claim at that point. But, she said, as to Rule 15, and she said, that issue, I am not going to hold that their post-judgment, because there's a conflict in the circuits on that. And therefore, I'm not going to use timeliness for the Rule 15 part of the case. I'm going to go to futility. Now, you're not arguing that we ought to adopt the rule in some circuits, as I understand your brief. You're not arguing we ought to adopt the rule that says, if you fail under Rule 59, you also cannot amend under the liberal standards of Rule 15. No, I'm not. Okay, all right. So, it seems to me, as I read her opinion, it's pretty clear that she moves on from the timeliness, which is limited to the Rule 59, to talk about the amendment, in which case she says, it's just a question, pure question of futility, which means we have to reach the merits of the amended complaint. Do you disagree with that? Well, Your Honor, I would note, first of all, that the way the appellants characterized Judge Hewitt's ruling is that some of their claims were denied as untimely. And, I mean, there's a section of their brief that's devoted to that. But what really matters is how Judge Hewitt characterized what Judge Hewitt did. And I think my reading, unless you can point me to language in the opinion that's contrary to this, I think my reading is correct. Well, I can't point you to language that's contrary to it. I'm happy to address the merits of those claims, because it is clear that she did rule that they, if pleaded, would be futile. And I think the trial court got that exactly correct. And if I might, I'd like to address the claims that were in the original complaint briefly first, because I think it's important that we orient ourselves to how this claim was filed and pleaded. So the appellants are saying that they are bringing a physical takings claim, and that's been their assertion from the beginning. Both in the pleadings and on the briefs, the appellants have argued throughout that it's a physical takings claim, the imposition of a flow ageism. Right. Inverse condemnation of flow ageism. That's right. Right. But there can't be a physical takings claim without some physical invasion or occupation of property. And so, again, apart from the survey markers and to the extent to which they might represent some type of Loretto claim, which we've discussed, and that's not a claim that they pleaded. Beyond that, they have not identified a physical invasion or occupation that would substantiate a claim for a flow ageism. And Mr. Froelich was saying the same here at the podium a moment ago, that they concede that their property has never flooded to any depth at any time as a result of the operations of Prado Dam. And really, Your Honor, I think that's sort of the end of this case. I mean, their complaint is that there is a present flow ageism over top of their property that exceeds the ones the United States has held since the 1940s, which go up to a line of 556 feet above sea level. They're saying that the United States now holds a present easement over the property between the 556 line and the 566 line. That's just not the case. The United States does not assert that it owns such an easement. If plaintiffs were to develop their property in some manner inconsistent with the notion of that easement, there's no federal law or restriction that would prevent them from doing that. What was the legal consequence of the survey and the markers in 1998? So, Your Honor, there's a couple answers to that. I think one is, I would point the court to the Mesa Ranch case, which is one that Chief Judge Hewitt focused on. When I say legal consequence, I don't mean vis-a-vis taking. I mean the legal consequence in either increasing the government's rights vis-a-vis the property or restricting the plaintiff's rights. Well, not as I understand it, and I think it probably would be a matter of California law and it hasn't been briefed. Certainly the appellants haven't indicated what effect it has. They do acknowledge that that survey was recorded in a book of surveys. It wasn't recorded as against the chain of title. That's one of the reasons they're saying, well, we never knew about this. It was in the book of surveys. It wasn't an assertion of title by the surveyor. What were you expecting? Whoever did it, I guess it was done by Orange County, wasn't it? It was commissioned by Orange County. They're the local project partner for the Corps of Engineers on this project. What was the point of doing the survey and putting the markers in if it didn't have any legal consequence? Well, I think any number of planning activities prior to a condemnation or a potential condemnation might take place without there being any legal effect. Okay, so this is basically to tell the Corps, the county, and the plaintiffs, this is exactly what property would be subject to the condemnation if it occurred. Yes, Your Honor, and I view it very similarly to the map, for example, that was at issue in the Mesa Ranch case. That case is one where some property was earmarked to be included within the Point Reyes National Seashore, and it was placed on a map, and the federal government said, we intend and hope that this property is going to be included as part of the seashore, but they hadn't actually condemned it, and there were statements very similar to the kinds of statements alleged in the complaint here made by the Army Corps of Engineers to the effect that the property would be included as part of the National Seashore. Just like here, there are statements to the effect that the appellant's property might be included as part of this higher flood inundation plain, and those kinds of statements, those kinds of planning activities, the map, threats of condemnation, if you want to call them that, and that's what the appellants allege in their complaint, or even the Mesa Ranch Court held, and of course, appellants allege here too, activities by the federal government to persuade local zoning boards to zone things a certain way. None of those kinds of planning activities are considered a taking. Well, at a certain point, though, you would agree. I mean, you made this flat statement earlier that you cannot have physical taking without appropriative action in the property, but you have cases like Drake's Bay, in which what was done was to surround the property, to bar access to the property, to essentially render the property valueless and useless to the party, and the court said, yeah, that's a taking, and I take it a physical taking, not just a regulatory taking, but a physical taking of property that was not appropriated in a formal way by flooding or anything else. So your strict hardline rule isn't quite so hardline, is it? Well, Your Honor, I think that is an exceptional case, and it's not one that there's a whole lot of... Right, to answer the question, but you'd agree that there are exceptions to your hardline rule, correct? Yes, Your Honor, but I would agree... The question then comes, is this case within the ambit of cases like that? I think it's clearly not. So I think Chief Judge Hewitt did a really good job of distinguishing between the circumstances in Mesa Ranch and those in Drake's Bay, and it's perfectly clear that the kinds of activities we're talking about here, inclusion of property on a map, just a statement to the effect that some easement may be taken in the future, even, again, it's alleged in the complaint here, and that's what we're dealing with, is accepting those allegations is true, but they allege that the United States worked with the city of Chino to develop these zoning rules, but all of those things, threats, maps, and local zoning rules, are clearly on the side of the ledger of things that don't constitute a taking, and that's Mesa Ranch. But wouldn't this, if this... What concerns me here is that if we adopt your position, lock, stock, and barrel, it seems to me we've just invited the Corps or any other governmental entity, state or federal, to avoid condemnation in a fluid easement type situation, particularly if you're talking about fluids that's only going to occur on a 100-year basis or something, once every 100 years, once every 50 years, you just don't condemn, but you arrange to zone the property to floodplain status, and then you don't have to pay anything. Why isn't that a concern that the landowners ought to have about the position that you are taking? Let me raise two issues with respect to that question. One is, I think, sort of the opposite result, if the Corps didn't adopt the rule, which I think is controlling law to begin with, but if the Corps adopted some different rule that the authorization to condemn was an obligation to condemn, and that if there was a project where there was some prospect of future flooding or even some determination that there could be future flooding that the United States was obligated to condemn, I think that would really turn the tables in terms of providing a lot of unwarranted leverage to landowners to force the United States into negotiations over condemnation where they're holding all the cards. Sure, but let's assume, and I did want to ask you also about the status of the project and the dam and so forth, but before we get there, let's assume for present purposes that the completion of the dam in 2008 constituted the completion of the project for purposes of flood control and ultimately possible flooding up to the 566 line and so forth. So there wasn't anything further that needed to be done. This was not a, we're planning, we're proposing, we're asking for legislation or any of that. It's done. So if there's no taking in the it's done case, then why hasn't the government, in effect, gotten everything it would have gotten from a flowage easement, which it would have had to pay for in a condemnation proceeding, for free? Well, it hasn't. First of all, that is the law. I mean, that's the Danforth case. Well, but I'm not sure about Danforth. Danforth is, I know the sentence you're talking about in Danforth, but it's a little unclear what the burden of the flooding... Sure. Well, it does say that flooding actually experienced must be incurred before a physical taking would arise. I mean, that... I don't think they use the word experience. I think... I'm quite certain, Your Honor, it says actually experienced. Actually experienced of caring for floods. That's right. And the caring for is the word that I focused on because is a party caring for floods at the point at which he is at risk of floods, or are they actually saying, you actually have to be flooded before you get any kind of right to claim a flowage easement? I think it's clearly the latter, Your Honor. I mean, one case I would point to, and this was decided on rightness grounds, but it's a very similar principle, and it's in our briefs as the Cloutier case, in which the Army Corps of Engineers had constructed a flood wall in Morgan City, Louisiana, such that whenever flood gates were opened, a strip of property that was outside the flood walls would flood to a certain height, and the Corps modified that project so that the flood walls  But the landowners outside the wall sued, and they said, look, you're raising the height of the flood wall. You're now threatening us with the potential for higher floods, and this court affirmed a ruling of the claims court that said, well, but... We didn't have an opinion, I don't think, did we? I don't think so. But to bring you back, if I could, to the question I was asking before we got off onto Danforth, why wouldn't this put the government in a position, if it can finish the project, it's done everything it's going to do, everything is going to be complete, it's not hypothetical anymore, the flooding is going to occur just as planned whenever it occurs, and yet it doesn't have to pay for the easement. Why isn't that a problem that should concern us? I think the United States would have to pay for the easement if and when the property is flooded in such a way that creates a taking. That is the fundamental to physical takings law, is that once the property is flooded in a way, and again, not every flooding would be a taking, but once it's flooded in a manner that's commensurate with a taking, then the United States would have to pay, and it would pay. I just wanted to address the Arkansas game case, because I know the appellants spoke about it at some length, and I guess one thing that needs to be said is that whatever else Arkansas game decided, it didn't rule that a physical taking could occur without a physical invasion or occupation. That case was about flooding that did take place over a period of years, and the question was very expressly about whether it was a temporary or a permanent taking. One final question, though. The dam is complete. The project, and I understand the project had three phases, but I gather the other two phases, which were not described in any detail in the record, but the other two projects have nothing directly to do with this property and this dam. Am I correct? I'm not sure that's entirely true, and I would point out that on page 54 of our brief, we do cite to the Corps of Engineers press release, which is referred to in the appellant's complaint, and it is of record in that sense. Chief Judge Hughes decided not to rely on it in her ruling, but it is referred to in the complaint. It indicates that at least as of the time the complaint was filed, the project remained ongoing, and I understand it does remain ongoing. There's a lot of funding that's still required to complete it. One aspect of the project that remained ongoing at least at the time of the filing of the complaint, and I believe still, is that the spillway had to be raised by 20 feet. The dam, it's got a lot of moving parts, and you can't just say, well, because we've increased the area in which water would be impounded, everything that would affect these landowners is done. That's not true. In order for it to be operated, the whole project needs to be completed, and it's not just something downstream on the Santa Ana River that's got no bearing on the Prado Dam, it's the spillway for the dam. Now, okay, I think I understand. Well, let me just ask anyway, because I'm not sure I understand. What's the relationship, I take it, between the height of the dam and the... Sure. This is because the dam, this is back up the reservoir from the dam, this property, and therefore the higher the dam, the higher the potential flooding goes before the dam gets overtopped? The water is being impounded by the dam. Right. But in order for it to be released, the spillway has to be constructed in a way that relates to how the water is being impounded. So what I'm saying is that the spillway would need... You can impound water to a certain degree, but only if... You would only operate it that way if you had a mechanism for releasing it. And what I'm saying is that those two things are interrelated. Okay. All right. You're answering a more sophisticated question than I asked. Okay. Let me ask a fairly simple-minded question. Okay. The reason that raising the dam by 28 feet results in increasing by 10 feet the amount of potential flooding is because that property is behind the dam and therefore... That's how I understand it. All right. All right. Yes. Thanks. Last thing, I guess, to your honors. I did note that the counsel for repellents noted that he might raise some new arguments or perhaps rely on some new cases in this rebuttal. And I just wanted to stake out the position that if that's going to happen, we'd like an opportunity to respond. Fair enough. Okay. Thank you. All right. Yes. We were going to restore you three minutes, and since we went over a few minutes, we'll give you five minutes of rebuttal if you need it. Thank you so much. Let me just say, the government is arguing all of these cases that are pre-Arkansas, and they completely misread the Arkansas opinion. The Arkansas opinion says that, number one, these cases are physical takings. And they say that flooding is not... Okay, this is the important thing about Arkansas. It says that it's just like every other taking. In other words, they said there's no per se rule. And then it goes on for the first time. This is the first time that any physical takings case in history says this point. It says that we will now use the Penn Central factors to determine the question of whether there has been a take. Okay? In all of these physical takings cases. Not just flooding, in all of them. And it says the key factor that we will look at when we look at Penn Central in a physical takings case is the character of the governmental action. As, and the court goes on to say, as determined by fairness and justice principles. Doesn't the Arkansas case also say that in order to have a physical taking, that you need to have a physical invasion? It doesn't say that, Your Honor. It says that in the particular case that they had before them, there was a temporary flooding as opposed to a permanent. And therefore, they wiped out the Cress and Sanguinetti cases. And I understand this court was compelled to rely on Sanguinetti and Cress at that time because the Supreme Court had never disavowed them. But I think the important thing is that Lindlow in 2005 said that all of these dedication easements cases, these rails to trails easement cases, the navigation servitude cases, all of these are non-flooding cases, but they're all physical takings. They involve the dedication or the compulsion of an easement. And they are physical takings cases. That's what Lindlow makes clear. And Arkansas cites back to Lindlow. And I think what's important about this is that if you look at the extraordinary nature of this, the 11 actions that they took, they acquired every property around our property and paid compensation for that. They argued that this was just planning. The government might be compelled to actually acquire easements in these cases. Well, the fact of the matter is that the court has said no matter what the purpose of the government in doing these kinds of actions, they will not accept the slippery slope argument that is made by the government. The slippery slope argument, Arkansas said, was we don't have to condemn where we can just let this property suffer. Let it be under this cloud of title and let it be under the fact that surrounding entities are going to obey the court's decision to impose these easements. The court said no. What is the purpose of the government doing that? To save money. The reason why they imposed this negative easement was clearly for the purpose of avoiding the payment of compensation. And by avoiding the payment of compensation, they put this negative easement on because if we had actually built, as the government says, oh, we could have gone ahead and built on this property with this in favor, right? And then the government would have done what? It would have had to pay for buildings and structures and uses and all kinds of things. So no, they want this negative easement. But the very simple purpose of keeping this land barren, of making sure that this land can never be used. And what I think is important is they never addressed Arkansas. And that's not a case that we didn't raise in our plea. They never addressed the fact that it's a Penn Central character of the government and those 11 actions that they took around this property. And the fact that I want to finish with one point, Ron. I'm sorry. Do you have a question you want to ask? No, go ahead. OK. I want to finish with one more thing. The Hurley case that the CFC Judge Hewitt rejected, the Hurley case is reiterated in the Gerlaub case that followed Sponenbarger in Danforth. And it was reiterated in Dickens. And those cases specifically stated, Hurley says, and Hurley has been affirmed again and again, but Hurley says, we may assume that as charged, the mere adoption by Congress of a plan of flood control constitutes a taking of it as soon as the government begins to carry out the project. Well, you skipped over the beginning of that sentence. Did I? No, but you didn't start emphasizing the words. No, no, no. We may assume. We may assume means, and the context of the case seems to me this makes it perfectly clear, means we don't have to decide the question that they went on to describe. Because they didn't have first English at that time. In other words, they didn't have. So Hurley doesn't really help you in this case, as far as I can see, at all. Let me just say this. This ban is finished. And Hurley simply said it. OK? And it's never been repeated. That if that which has been done or is contemplated does constitute such a taking, the complainant can recover just compensation under the tougher. Now, we know that Hurley was rejected on the procedural grounds, that they brought an injunction instead of asking the court for compensation. But the case was subsequently settled. And the government paid the compensation. But listen to the language in Gerlaub. We think the reasoning behind this decision would come whenever the defendant's intent to take has been definitely asserted. And it begins to carry out that intent. So long it is conjectural, all right, whether or not the defendant will actually take it, a taking is not curved. But when conjecture ripens into a definitely assertive purpose and steps are taken out to carry out that purpose, the taking may be said to have occurred. And finally, in Dickinson, in 1946, the government said, we are not now called upon to decide whether in a situation like this, a landowner might be allowed to bring suit as soon as inundation threatens. Assuming such an action would have been sustained, it is not a good enough reason why he should sue them or have from that moment the statute of limitations run again. So I'm urging this court. The 11 factors of what this government did, the building of the dam. And by the way, we were never flooded in answer to your question to ask the government. We were never naturally in the Santa Ana flood zone. We're not behind the dam. In other words, we're not flooded by the dam's accretion. We're in front of the dam. Well, that's why. Right. No, go ahead. That's what I was confused by because no one explained this. And I thought your opposing counsel was suggesting that your property is flooded because when you raise the level of the dam, the amount of water in the reservoir increases and goes back. But you're saying the contrary. And it looked to me like the maps indicated the contrary. Why does the raising of the dam increase the flooding of your property? Yeah, because what happens is, see, when they raise the dam, they also flood back properties that are subject to the same dam. Right. But we're in front of the dam. But when a flood reaches the level of the dam, it overflows onto our property. It's not the back of the dam. We're the front of the dam. Right. But it would overflow even earlier if they hadn't built the extra 28 feet onto the dam. Yeah, but we're not responsible. They put us into this floodplain. We were never in a floodplain. They built this dam and threatened us to fly 50 feet. I don't understand physics, but our hydrology, I guess, I don't want to carry that on. No, no, no. Just a simple thing. It's physics and engineering. When the dam rises, the extra 20 feet, because they're now filling it up with more water. When it rises and the 100-year floodplain occurs, it's going to overflow the dam onto properties in front that were never in any floodplain when that came up. Right, and that was true before the 28-foot extension was put on the dam. It was true for the 556. That's what would have happened. But it isn't true because they would only have had enough water to flood 556. When they extended it up, they increased the amount of water that would overflow, and that's why it raises it to the 560s. Look, I mean, there are a lot of things. I just want to say one last thing. Why is it not that these are, as Arkansas says, ad hoc factual includes, character of the government action, fairness and justice. CFC rejected fairness and justice. Arkansas says, you're wrong. Arkansas says fairness and justice is a key element of a physical takings claim. Well, why are we not entitled to discovery and entitled to have these issues decided on a full record? Why is our complaint dismissed? Because there's this per se rule that you have to have actual flooding. That's what the government said, and that's not at all what Arkansas said. And I apologize. I think we have your argument. Thank you. Thank you so much for your time and your patience. Thank you. We thank both parties and cases submitted.